# EXHIBIT 1

Jared D. Scott (#15066)
Anderson & Karrenberg
50 W. Broadway, Suite 600
Salt Lake City, Utah 84101
Telephone: (801) 534-1700
jscott@aklawfirm.com

*Attorneys for Plaintiff*

**This Complaint requires you to respond. Please see the Notice to Responding Party attached to the Summons.**

## IN THE THIRD JUDICIAL DISTRICT COURT
## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| STERLING KELLY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PROG SERVICES, INC. d/b/a MONEY APP,<br><br>Defendants. | <u>**CLASS ACTION COMPLAINT**</u><br><br><u>**JURY TRIAL DEMANDED**</u><br><br>**Case No: 250908265**<br><br>**Judge Thaddeus May** |

Plaintiff Sterling Kelly, a Specialist in the U.S. Army ("Plaintiff" or "Specialist Kelly"), on behalf of himself and all others similarly situated, alleges the following based upon personal knowledge as to himself and upon information and belief and the investigation of his counsel as to all other matters, and brings this class action against Prog Services, Inc. d/b/a Money App ("Money App" or "Defendant") and alleges as follows:

### I.     NATURE OF THE ACTION

1.     This Complaint seeks to protect active-duty military servicemembers from Money App's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA") and the Truth in Lending Act, 15 U.S.C. § 1638 ("TILA").

1

2.      The MLA was enacted to protect United States active-duty servicemembers and their dependents (collectively, "Covered Borrowers"[1]) from predatory lending. Excessive debt endangers our nation's military readiness and is detrimental to service-member retention, morale, household stability, security clearances, and career advancement. Notably here, Money App makes no effort to fulfill its duty to determine whether it is lending to Covered Borrowers or to provide mandatory legal protections for them.

3.      Money App is in the business of payday lending through an earned wage access ("EWA") product—it makes funds available to its customers, who repay Money App principal and finance charges (including expedite fees) on or just after payday. Its business model entails making high-frequency, short-term, and high-cost loans to consumers living paycheck to paycheck. Despite advertising its loans as "no interest," in practice, Money App takes in triple-digit finance charges for the loans it issues—with APRs on some of its loans to Plaintiff as high as 474%. The end result is a financial product that extracts exorbitant fees from servicemembers and their families, encourages serial usage and dependance on the costly loans, worsens borrowers financial circumstances, and traps them in a cycle of debt.

4.      Plaintiff, a Specialist in the U.S. Army, has used Money App's cash advance product on multiple occasions. By virtue of the sky-high fees charged for borrowing against his salary, Money App has extended consumer credit to Plaintiff in violation of the MLA and TILA.

5.      Borrowing money that is repaid on payday is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products trap borrowers in a cycle of reborrowing that increases their

---

[1] "Covered borrower means a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a covered member... or a dependent ... of a covered member." 32 C.F.R. § 232.3.

financial distress, all in service of generating revenue for predatory lenders. Considering the substance of the transactions, Defendant's payday loan transactions are in reality extensions of consumer credit.

6.      In violation of the MLA, Defendant uses its cash advance product to saddle Covered Members with charges that, on average, yield a military annual percentage rate ("MAPR") well in excess of the MLA's legal limit.

7.      Money App's consumer credit agreements violate the MLA in at least three ways: By (1) charging interest above the 36% statutory Military Annual Percentage Rate (MAPR) cap; (2) failing to provide required MLA Disclosures; and (3) requiring access to the borrowers' deposit account as security for the loan. 10 U.S.C. § 987(b), (c) & (e)(5).

8.      Money App systematically violates the Truth in Lending Act by failing to make required disclosures concerning the interest rate charged as part of its loan agreements with consumers.

9.      Among the abusive lending practices that the MLA was designed to curb was predatory payday loans made to servicemembers.[2] In a Department of Defense report on predatory lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the payday lending industry were highlighted.[3] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[4] Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday

---

[2] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.
[3] *Id.* at 10–16.
[4] *Id.* at 10–11.

loan," with such loans costing servicemembers over $80 million in abusive fees annually as of 2005.[5]

10.     Money App's business practices violate the MLA and TILA and are part of a systematic nationwide policy and practice. Specialist Kelly seeks to hold Defendant accountable for its actions and prevent its predatory lending practices from continuing.

## II.    JURISDICTION AND VENUE

11.     This Court has general personal jurisdiction over Defendant because Defendant corporation is headquartered in Utah.

12.     This Court has subject matter jurisdiction pursuant to Article VIII, Section 5 of the Utah Constitution.

13.     Venue is proper in this district because Defendant's principal place of business is in the district at 256 W Data Drive, Draper, UT 84020.

## III.    PARTIES

14.     At all times relevant, Specialist Kelly was a natural person and resident of El Paso County, Texas. He has been a member of the United States Army since June 2023.

15.     During the class period, Specialist Kelly was a Covered Borrower and an active-duty servicemember employed by the United States Army.

16.     Defendant Prog Services, Inc. d/b/a Money App is a Delaware corporation with its principal place of business at 256 W Data Drive, Draper, UT 84020. Money App transacts or has transacted business throughout the United States.

17.     Money App has offered Cash Advance Agreements to consumers, including Covered Borrowers for years, entering into over one million credit transactions.

---

[5] *Id.* at 11.

## IV.    TOLLING OF THE STATUTE OF LIMITATIONS

18.    The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. § 3901, *et seq.*, tolls any and all limitations or repose periods for all active-duty military members, including those similarly situated to Specialist Kelly, until their active-duty service concludes. Specifically, § 3936(a) of the SCRA provides:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

## V.    LEGAL BACKGROUND

### The MLA Was Specifically Designed to Curb Predatory Payday Loans to Covered Members

19.    The DoD's Report on lending practices discussed the payday lending industry at length.[6] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[7]

20.    Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers millions in abusive fees.[8] Moreover, the military payment architecture, and the Uniform Code of Military Justice to which servicemembers are bound, make them particularly vulnerable to predatory payday loans:

> Check-holding, a central feature of payday loans, is particularly risky for military borrowers. Every payday loan involves a prospective "bad" check. Military borrowers are required to maintain bank accounts in order to receive direct deposit of military pay and are subject to the Uniform Code

---

[6] Report, *supra* note 2.
[7] *Id.* at 10–11.
[8] *Id.* at 11.

5

of Military Justice that penalizes deliberately writing a check not covered by funds on deposit. Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.[9]

21.    While app-based EWA products are a somewhat recent development, the genre (small-dollar, short-duration, high-cost loans) is nothing new. In 2006, the DoD noted military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans, and 'military loans' via the Internet."[10] Those loans, like Money App's, "are delivered and collected online through electronic fund transfer."[11]

22.    The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate Money App's business model:

(1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit. These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

(2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[12]

---

[9] *Id.* at 14. To be sure, EWA providers like Money App do not collect physical checks from their customers at loan initiation, but instead take a virtual check by requiring Covered Members to authorize automatic debits from bank accounts to repay their loans.
[10] *Id.* at 15.
[11] *Id.* at 16.
[12] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrow to consider loan payments as being their top priority." *Id.* at 44.

6

(3) . . . Increasingly the Internet is used to promote loans to Service members.

(4) Predatory products feature high fees/interest rates, with some requiring balloon
payments, while others pack excessive charges into the product. The result of
their efforts is to obfuscate the comparative cost of their product with other
options available to the borrower

. . . .

(6) Predatory lenders attempt to work outside of established usury limits, either by
attempting to obtain exemptions from federal and state statutes or by developing
schemes designed to circumvent existing laws.[13]

23.    The Report further found "high interest loans, whether provided as a payday
loan, military installment loan, or as a result of unscrupulous automobile financing can leave
a servicemember with enormous debt, family problems, difficulty maintaining personal
readiness and a tarnished career."[14] As if being trapped in a debt cycle is not bad enough, some
servicemember victims of payday and other lenders experienced disciplinary action (ranging
from reprimands to "loss of promotions and separation from the military") as a result of their
financial hardship.[15]

24.    Drawing from the bountiful evidence of servicemember abuse at the hands of
predatory lenders, the DoD concluded it could not "prevent predatory lending without
assistance from Congress, the state legislatures, and federal and state enforcement agencies."[16]

---

[13] *Id.* at 21–22.
[14] *Id.* at 39.
[15] *Id.* at 41–42.
[16] *Id.* at 46.

7

25.    To curb usurious interest rates, excessive annual percentage rates (APRs), and bogus fees, the DoD requested legislation that would prevent lenders from preying on servicemembers and endangering the nation's military readiness.[17]

26.    The American Bar Association and others expressed support for the DoD's request, noting the urgent need for remedial Congressional action to curb predatory loan practices harming servicemembers. The legislation requested was supported by the DoD, military and veterans organizations, legal aid organizations, consumer advocacy groups, faith-based organizations, and of course lawmakers.

27.    Congress answered the call and passed the MLA to protect Covered Members from unfair, deceptive, and excessively priced loans.

a.    **The Military Lending Act**

28.    In the wake of the DoD's investigations, in 2006, Congress passed the Military Lending Act, 10 U.S.C. § 987, *et seq.*

29.    The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

30.    The MLA also requires mandatory disclosures in "consumer credit"[18] transactions with Covered Borrowers, which include:

---

[17] The DoD requested legislation protecting servicemembers "from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in borrowing should be included in interest rate calculations and disclosures. Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states." *Id.*

[18] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Borrower primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3.

    a.   A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);

    b.   Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and

    c.   A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

31.    Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that requires the Covered Borrower to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e)(2)–(3).

32.    The MLA, too, prohibits creditors from using a "method of access to a deposit, savings, or other financial account maintained by the borrower . . . as security for the obligation[.]" 10 U.S.C. § 987(e)(5).

**b.    The Truth in Lending Act**

33.    The Truth in Lending Act, codified at 15 U.S.C. § 1638, protects consumers by, inter alia, (i) requiring lenders to clearly disclose all terms and costs associated with loans, (ii) allowing borrowers to easily compare different credit options, and (iii) preventing predatory lending practices by making loan details transparent and standardized. In essence, TILA promotes informed use of consumer credit by providing full disclosure of loan terms.

34.    Under TILA, creditors are required to make certain disclosures when participating in closed-end credit transactions, such as those Money App participates in here. Money App fails to make any of the following required disclosures:

    a.   "The 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(2)(A);

b.  "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," *id.* at § 1638(2)(B);

c.  "The 'finance charge', not itemized, using that term," *id.* at § 1638(3);

d.  "The finance charge expressed as an 'annual percentage rate', using that term," *id.* at § 1638(4);

e.  "The number, amount, and due dates or period of payments scheduled to repay the total of payments," *id.* at § 1638(6);

f.  "Descriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price' as specified by the Bureau," *id.* at § 1638(8);

g.  "Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type," *id.* at § 1638(9);

h.  "A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge," *id.* at § 1638(11); and

i.  "A statement that the consumer should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties," *id.* at § 1638(12).

## VI.    FACTS

### The Earned Wage Product Market and Money App

**a.    EWA Products Charge High Fees and Wreak Havoc on Borrowers' Financial Health**

35.    A significant driver of demand for consumer credit and financial products stems from the mismatch between when a family receives income and when they pay expenses. Employees generally provide services before being paid for their labor and are typically paid in arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for years turned to credit cards, personal installment loans, and payday loans.

36.    Recently, an old product with new packaging—coined "earned wage access" or "earned wage advance" ("EWA")—has been created and offered to consumers to address the same need. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

37.    EWA products provide workers, before their payday, with funds that purport to equal or approximate a portion of their unpaid wages. Loaned funds are repaid via automated withdrawal from the consumer's bank account.

38.    Defendant Money App is one such fintech company that provides an EWA service, which it calls simply "Cash Advance." Defendant's Cash Advance is marketed as "cash when you need it with no hidden fees." Money App represents on its website that its "Cash Advance repayments are automated, making it easy to pay on time. You will owe the amount you borrowed plus any fee for expedited delivery."

39.    To repay these loans, users must link their bank account to their Money App profile, provide a debit card, and authorize automated debits from their linked external bank account on the scheduled repayment date.

11

40.    EWA providers advertise their products as "free" or "no interest" while obscuring the ways in which they bilk consumers for fees and other finance charges that add up to loanshark rates.

41.    Money App, like its EWA provider competitors, is paid through expedite fees.

42.    Expedite fees (referred to by Money App as "Express Delivery" and "Expedited Delivery Fees") are charged to provide instant access to loan funds. For Cash Advances, Money App charges between $4.99 and $18.99 (less for smaller loans; more for larger loans). Just like with traditional credit products, borrowers must pay larger fees to access larger loans.

43.    Money App discloses the following fee table breaking down its fees:

| Cash Advance Amount | Expedited Fee |
| --- | --- |
| $25.00 | $4.99 |
| $50.00 | $7.99 |
| $75.00 | $9.99 |
| $100.00 | $12.99 |
| $125.00 | $13.99 |
| $150.00 | $14.99 |
| $175.00 | $15.99 |
| $200.00 | $16.99 |
| $225.00 | $17.99 |
| $250.00 | $18.99 |

44.    The actual cost to provide customers with instant access to funds is less than $0.05.[19]

---

[19] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at

45.     The speed of access to funds is an essential and defining aspect of EWA products. They are designed to address—and marketed as addressing—what is generally a less-than two-week liquidity problem.

46.     Money App's website, app, and marketing advertise instant or same-day access to hundreds of dollars of cash advances. For example, Money App advertisements include representations such as:

- "Get the money in seconds"

- "Cash Advance can arrive within seconds when Express Delivery is chosen, and your debit card's issuing bank allows for this type of transfer."

- "Want money in seconds? Express Delivery is exactly what you need."[20]

47.     While expedite fees are notionally optional and users can use an EWA product without paying one, they are difficult to access and negate their usefulness to consumers. For instance, Money App tells its customers that its free, non-expedited version of an advance will take "up to 3 business days" to receive, while the expedited service takes seconds. This delay is problematic for Money App's intended users, consumers living paycheck to paycheck who turn to Money App for the precise reason that their need for cash is urgent and cannot wait.

48.     Indeed, for advances taken the week of the borrower's next paycheck—even when the next payday is *more than* three days away—Money App disallows a free standard delivery option and requires users to select an Express Delivery with a mandatory fee:

---

https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/rtp_-pricing_02-07-2019.pdf.

[20] Similarly, Defendant boasts on its website that users can "Use your cash for any purpose – bills, emergencies, or unexpected expenses."



49.     When properly viewing EWA products' expedite fees as costs of credit (*i.e.*, finance charges), the annual percentage rates (APR) for these loans are eye-popping.

50.     A recent study found the average APR imposed by EWA providers is 334%, in line with payday loans:

**Total cost of using earned wage access products is close to that of payday loans**

The average APR for earned wage access advances is over 330%, according to 2021 data on transactions across five companies. Of the 5.8 million transactions completed by tip-based companies, 73% included tips.

*Annual Percentage Rates (APRs) help compare the total cost of borrowing money, including interest and fees:*

New car loans
7%

Credit card plans
21%

Wage-based cash advances that don't request tips
331%

Wage-based cash advances that request tips
334%

Payday loans
353%

Chart: Elyria Yale, CHMatters • Source: national average APRs for new car loans and credit card accounts with finance charges (2023 Q1) from the Federal Reserve; state average APRs for earned wage access products and payday loans (2021) from the CA Dept. of Financial Protection & Innovation • Get the data • Created with Datawrapper

51.    Money App positions itself as a lower-cost option for borrowers in need of quick cash, emphasizing on its website that with Cash Advance, "There's no interest, no monthly fee, no tipping, and no credit check!"

52.    In truth, Money App is a wolf in sheep's clothing: extending loans with APRs *exceeding* exorbitantly-priced payday loan products.

53.    The EWA "business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee . . . difficult to avoid."[21]

54.    The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and an ever-increasing reliance on emergency funds from—and the fees that come with—EWA loans.

55.    A Center for Responsible Lending ("CRL") analysis found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment, and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at

---

[21] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, CTR. FOR RESPONSIBLE LENDING, at 7 (Oct. 2024).

least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[22] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

56.    Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[23]

### b.    EWA Providers Utilize Strict Underwriting Procedures and, Consequently, Almost Always Collect

57.    While EWA products are financially disastrous for borrowers, they have proven profitable for the companies offering them. They maximize profits by using exacting underwriting procedures that ensure advances, and accompanying fees, are timely repaid through automated bank account debits that borrowers authorize when taking out the loans.

58.    Not everyone who creates a Money App account will qualify for a Cash Advance. To be eligible for a Cash Advance, borrowers must meet minimum qualifications set by Money App.[24]

59.    To determine whether a borrower is creditworthy, and decide how much credit to extend in the first place, Money App requires users to connect their accounts to Money App through a third-party service called Plaid.[25] Plaid partners with Money App and other fintech

---

[22] *Id.*

[23] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING, at 6 (Apr. 2024).

[24] To begin with, borrowers must provide a litany of personal information—including name, phone number, email, date of birth, and social security number—in addition to providing bank account data and access.

[25] Users signing up for a Money App account through the app are shown a screen directing the user to link their bank account.

companies to allow them to view data in customers' accounts. Plaid allows Money App to "[q]uickly verify assets and income" of Money App users, providing "real-time insights into a borrower's income and employment in seconds with a breakdown of earnings from salaries, gig work, and more."[26]

60.    Money App uses its real-time insight into customer accounts to ensure borrowers will have sufficient funds to repay their loans on payday and schedule debits on or immediately after the payday following any given loan, ensuring its loans are paid as soon as funds become available.

61.    Money App's underwriting process is detailed and considers many factors. Money App continually adjusts eligibility and maximum withdrawal amounts depending on the individual's borrowing history and financial health (as gleaned through Plaid). In determining how much credit to extend, "Money App assesses a consumer's bank account history to determine their ability to repay."

62.    Similarly, Money App discloses that it bases its decision of whether to offer Cash Advance, and in what amount, on factors like: "(i) whether you have established a direct deposit into your Linked Account and (ii) an analysis of your deposit and transaction history."

63.    Qualifying for a cash advance is by no means guaranteed. Money App notes that "[n]ot all applicants will qualify" for its Cash Advances. During the class period, many users who created a Money App account, provided all the information (including sensitive demographic information and bank account access) requested, and signed up to pay were deemed by Money App unqualified for a Cash Advance.

---

[26] *Plaid Solutions: Credit*, PLAID.COM, https://plaid.com/solutions/credit/ (last visited Oct. 6, 2025).

64. For borrowers who qualify, Money App strictly monitors their financial health to determine whether they are eligible and, if so, how much credit to extend based on borrowers' default risk and ability to repay. Through its constant underwriting process, Money App extends loans to borrowers only when it is confident they will repay.

65. For qualifying borrowers, Money App generally begins by offering relatively low amounts of credit: first-time users are eligible for a maximum of $100.00 and repeat users could borrow up to $250.00.

66. Borrowers obtain greater access to credit—*i.e.*, Money App raises their maximum loan limit—by consistently paying off loans to Money App on time and generally improving their financial health (which Money App monitors through the borrowers' bank balance, spending behavior, repayment history, and income).

67. These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by traditional credit issuers, like banks. "US credit card lenders individualize interest rates and credit limits according to assessments of customers' default risk."[27]

68. In addition to these loan qualification procedures, borrowers must link their bank account (that receives a consistent source of directly deposited income) to their Money App profile to ensure seamless repayment.

---

[27] Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, FED. RESERVE BANK OF BOSTON (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client pool into broad risk classes by way of their credit scoring systems. . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, ARMED FORCES BANK (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/whatare-credit-limits-and-how-are-they-determined.

69.    During the cash advance request process, Money App prompts users to select the date of their next direct deposit—restricted to within 13 days for most users—and to confirm the same as a repayment date.

70.    When applying for a Cash Advance, borrowers must authorize Defendant to automatically debit their loan repayment from their linked debit card on their next payday. To do so, borrowers are required to initially agree that after "confirming [a] Cash Advance, I acknowledge that the funds will be withdrawn from my account on the [Payback Date]":



71.    Next, borrowers must authorize Money App's automated repayment debits by agreeing to the following statement: "By confirming, you authorize Money App and its partners to make a one-time withdrawal of up to $[advance amount] from your Debit Card

19

ending [####] on or after [the Payback Date]." *See infra* ¶ 78.[28] It is impossible for a borrower

to obtain Defendant's Cash Advances without pre-authorizing a repayment debit.

72.   Defendant repeatedly reinforces that borrowers owe a debt. For example,
Defendant shows borrowers who have taken an advance screens in the app indicating that they
have an amount that is "due" and will be paid by "Auto payback" on the Repayment Date as
the exemplar screenshot below reflects:



73.   Likewise, Defendant includes an FAQ on its website and app about repayment
that provides, in relevant part: "Cash Advance repayments are automated, making it easy to
pay on time. You will *owe* the amount you borrowed plus any fee for expedited delivery (only
if selected!)" (emphasis added).

---

[28] In its terms of service, Money App "reserve[s] the right to charge *any* Payment Method for
Cash Advance repayment any time on or after the pay back date provided to [borrowers]
through the Money App mobile application." Defendant further notes that "Each Cash Advance
is repayable in one installment."

74. Defendant's app also requires borrowers to acknowledge the "Payback Date" and Defendant sends borrowers confirmation emails after an advance is taken reiterating the "Repayment Date."

75. Finally, Defendant refers to Cash Advance users as "borrowers" on its app:

> Cash advances are provided by Prog Services, Inc. (Money App) Individual borrowers must be U.S. Citizens, permanent residents, or non-resident U.S. Aliens and at least 18 years old. Valid bank account and Social Security Number are required. All cash advances are subject to ID verification. All cash advances are subject to approval.

76. Failure to pay back a Money App Cash Advance loan results in losing eligibility for further cash advances until the outstanding balance is paid.

77. In sum, Money App's underwriting process requires, before any money changes hands, that borrowers: (1) demonstrate they receive regular, consistent income (2) in an amount sufficient to cover existing obligations and a Money App Cash Advance; (3) link the bank account to which direct deposits are received to Money App through Plaid; (4) authorize Money App to automatically debit the linked debit card or connected bank account on or around the borrower's payday in an amount that is equal to the cash advance the borrower receives (the principal loan amount) plus fees; and (5) be current on all prior Cash Advance loans. Borrowers who fail to complete these steps cannot obtain cash advances.

78. What's more, Defendant provides no mechanism for cancelling repayment debits through the app. Once a Cash Advance has been taken, the app does not allow users an option to cancel the repayment debit or disconnect their bank account from which repayment is automatically scheduled to be drawn. Even worse, Money App affirmatively discloses to borrowers taking an advance that repayment is not cancellable:

☐ I agree to the terms of the **Cash Advance**
Agreement and the Credit and Debit Authorization.

☐ We cannot cancel after you confirm. By confirming,
you authorize Money App and its partners to make
a one-time withdrawal of up to $29.99 from your
Debit Card ending in ▮ on or after 10/10/2025

> Hold to Confirm

79.     Through these underwriting procedures and policies, Money App ensures it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges, from the linked account as soon as the borrower's next payday is deposited.

80.     These debt collection methods are so successful that EWA lenders recoup their advances at least 97% of the time using these tactics.[29]

**c.      Money App's Loans to Plaintiff**

81.     Specialist Kelly is currently an active-duty member of the United States Army stationed at Fort Bliss in El Paso, Texas.

82.     He has been an active duty servicemember since June of 2023 and will remain on active duty until at least January of 2028.

83.     Defendant extended consumer credit to Plaintiff in the form of Cash Advance transactions like those discussed above.

84.     Plaintiff used the loans from Money App for personal, family, or household purposes.

---

[29] Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Fin. Health Network (April 2021) at 2, available at https://cfsi-innovation-files2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

85.     Plaintiff paid Money App's finance charges, in the form of Express Delivery Fees, to obtain cash-advance loans from Money App.

86.     A small selection of Cash Advance loans made by Money App to Plaintiff (and accompanying Express Delivery Fees) are shown in the below table, with the cost of credit and APR included:[30]

| Date | Principal Amt. | Express Delivery Fees | Loan Period | APR |
|------|---------------|----------------------|-------------|-----|
| 08/1/25 – 08/14/25 | $100.00 | $12.99 | 13 days | 365% |
| 08/18/25 – 08/28/25 | $100.00 | $12.99 | 10 days | 474% |
| 09/3/25 – 09/15/25 | $250.00 | $18.99 | 12 days | 231% |

87.     Specialist Kelly has received many usurious loans from Money App since he started using the service. For much of the relevant period, Specialist Kelly took out a loan each pay period and was forced to take out another loan immediately after repayment of his last loan.

88.     The Express Delivery Fees attendant to Defendant's loans are immediately and directly connected to Money App's extensions of credit to Plaintiff.

89.     Further, Money App's credit agreement required Specialist Kelly to provide access to a deposit account and to preauthorize payment from that account, as security for Money App's extension of each payday loan, in violation of 10 U.S.C. § 987(e)(5). Money App's credit agreement also failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c) and TILA.

---

[30] These APR calculations are solely demonstrative.

## CLASS ALLEGATIONS

90.     Specialist Kelly seeks to represent two classes of individuals pursuant to Utah Rule of Civil Procedure 23.

91.     Specialist Kelly seeks to represent the "MLA Class" and the "TILA Class" (collectively the "Classes"). Specialist Kelly brings this action individually and on behalf of classes of which he is a member and initially defined:

> **MLA Class**: All Covered Members and dependents of Covered Members to whom Money App extended a "Cash Advance" (or substantially similar) product, in which the borrower incurred a finance charge (including, without limitation, an Express Delivery Fee).

> **TILA Class**: All Covered Members and dependents of Covered Members to whom Money App extended a "Cash Advance" (or substantially similar) product, in which the borrower incurred a finance charge (including, without limitation, an Express Delivery Fee). .

92.     Expressly excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) Money App and any entity in which Money App has a controlling interest, or which has a controlling interest in Money App, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

93.     Specialist Kelly reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

94.     **Numerosity**. Money App's scheme has harmed and continues to harm the members of the Classes. The members of the proposed Classes are so numerous that joinder of all members is impracticable.

95.     The exact number of Class members is unknown, but Money App has made at least hundreds of thousands of loans. On information and belief, many thousands of those loans were made to Covered Borrowers.

96.     **Commonality**. Common questions of law and fact affect the right of each Class member and common relief by way of damages is sought for Specialist Kelly and Class members.

97.     The harm that Money App has caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

a.  Whether Specialist Kelly and the MLA Class members are Covered Borrowers subject to the protections and limitations of the MLA;

b.  Whether Money App is a "creditor" subject to the requirements of the MLA;

c.  Whether Money App's loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA and TILA;

d.  Whether Money App entered into standard form Loan Agreements with Covered Borrowers;

e.  Whether Money App's loans exceed the MLA statutory rate cap of 36% MAPR;

f.  Whether Money App failed to provide required MLA disclosures in violation of the MLA;

g.  Whether Money App required access to Covered Borrowers' deposit accounts as security for its payday loans in violation of the MLA;

h.  Whether Money App failed to provide required credit disclosures in violation of the MLA and TILA;

    i.   Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

    j.   Whether Money App should be enjoined from continuing its lending practices in the manner challenged herein; and

    k.   Whether Money App is subject to punitive damages, and, if so, the proper measure of such damages and remedies to which Specialist Kelly and the Class are entitled under 10 U.S.C. § 987(f)(5).

98.    **Typicality**. The claims and defenses of Specialist Kelly are typical of the claims and defenses of the MLA Class because Specialist Kelly is a Covered Borrower and his Loan Agreements with Money App are typical of the type of personal, household, or family loans that Money App normally provides to Covered Borrowers. Additionally, Money App uses the same or substantially similar standard form Loan Agreements in all its lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. Specialist Kelly suffered damages of the same type and in the same manner as the Classes he seeks to represent. There is nothing peculiar about the Plaintiff's claims.

99.    **Adequacy**. Specialist Kelly will fairly and adequately assert and protect the interests of the Classes. Specialist Kelly has hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and Specialist Kelly has no conflict of interest that will interfere with maintenance of this class action.

100.    **Superiority**. A class action provides a fair and efficient method for the adjudication of this controversy. There are no unusual legal or factual issues that would create manageability problems; prosecution of thousands of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications against Money App

and could create incompatible standards of conduct; adjudications with respect to individual members of the Class could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and the claims of the individual Class members are small in relation to the expenses of litigation, making a class action the only procedural method of redress in which Class members can, as a practical matter, vindicate their legal claims and enforce their statutory rights.

101.    Money App has acted and refused to act on grounds generally applicable to the MLA Class, thereby making declaratory relief and corresponding final injunctive relief under the Utah Rules of Civil Procedure appropriate with respect to the Classes. Money App should be enjoined from making loans to Covered Borrowers in violation of the MLA and TILA and a declaration should be made that the loans are void from inception.

## VII.    CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF MILITARY LENDING ACT

102.    Specialist Kelly brings this claim on behalf of himself and the MLA Class, and incorporates paragraphs 1–101 by reference.

103.    The MLA prohibits a creditor from obligating a "Covered Member" or dependent of a Covered Member (collectively, "Covered Borrowers") to a loan in excess of 36% MAPR.

104.    A "Covered Member" in the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

105.    "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the consumer credit." 32 C.F.R. § 232.4.

106. Specialist Kelly and the MLA Class Members are "Covered Borrowers," subject to the protections and limitations imposed by the MLA. A Covered Borrower is a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

107. Specialist Kelly is a "Covered Member" with respect to his Money App Loan Agreements because Specialist Kelly is an active-duty servicemember who is obligated by law to repay loans he took out for personal, family, or household purposes.

108. Money App is a "creditor" subject to the requirements and limitations imposed by the MLA in that it engages in the business of extending consumer credit to Covered Borrowers protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

109. The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Borrower primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

110. Money App charged Specialist Kelly and the MLA class well above the 36% interest rate cap on their loans, in violation of the MLA.

111. Money App fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 in its standard form Loan Agreements, in violation of the MLA.

112. Money App's standard form Loan Agreements require the borrower to provide access to a deposit account as security for the payday loan in violation of 10 U.S.C. § 987(e)(5).

28

113.    As a result, Money App violates 10 U.S.C. § 987.

## COUNT II
## VIOLATIONS OF THE TRUTH IN LENDING ACT

114.    Specialist Kelly brings this claim on behalf of himself and the TILA Class and incorporates paragraphs 1–101 by reference.

115.    TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18. Money App's Loan Agreements are closed-end credit transactions because they are not open-end credit transactions. Open-end credit transactions are "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602.

116.    Among other requirements, the Regulation prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

117.    Money App is a creditor whose financing qualifies as "credit" under TILA and Regulation Z, and its Loan Agreements with consumers are therefore subject to TILA and Regulation Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

118.    Money App has not provided such disclosures before consummation of the Loan Agreements.

119.    Money App failed to provide such disclosures to Specialist Kelly and the TILA Class.

120.    As a result, Money App violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17 & 1026.18.

**PRAYER FOR RELIEF**

WHEREFORE, Specialist Kelly prays that the Court enter an Order:

A. Certifying this action as a class action as provided by Utah Rule of Civil Procedure 23, appointing Specialist Kelly as Class Representative, and appointing undersigned attorneys and their firms as Class Counsel;

B. Declaring that Money App violated the MLA and adjudging that Specialist Kelly and MLA Class Members' standard form Loan Agreements violate the MLA;

C. Adjudging that Money App violated the MLA and awarding Specialist Kelly and MLA Class Members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

D. Adjudging that Money App violated TILA and awarding Specialist Kelly and the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. § 1640;

E. Adjudging that Money App violated the MLA and award Specialist Kelly and MLA Class Members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

F. Awarding Specialist Kelly and the Classes, reasonable attorneys' fees and costs incurred in this action;

G. Enjoining Money App from continuing to engage in predatory lending practices in violation of the MLA and TILA;

H. Awarding Specialist Kelly, and the MLA Class, any pre-judgment and post judgment interest as may be allowed under the law; and

I. Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Specialist Kelly demands a jury trial on all issues so triable.

Dated this 9th day of October 2025.

ANDERSON & KARRENBERG


/s/ Jared D. Scott
Jared D. Scott
Attorney for Plaintiff


Lee Lowther (*pro hac vice* forthcoming)
Randall K. Pulliam (*pro hac vice* forthcoming)
Courtney Brown (*pro hac vice* forthcoming)
llowther@cbplaw.com
cbrown@cbplaw.com
rpulliam@cbplaw.com
CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Suite 1400
Little Rock, AR 72207
Phone: (501) 312-8500

Joshua Jacobson (*pro hac vice* forthcoming)
joshua@jacobsonphillips.com
JACOBSON PHILLIPS, PLLC
2277 Lee Road, Ste. B
Winter Park, FL 32789
Phone: (321) 447-6461
*Attorneys for Plaintiff*