Steven D. Burt (#11522)
Daniel J.T. McKenna, *pro hac vice*
Jenny N. Perkins, *pro hac vice*
Robert T. Lieber, *pro hac vice*
J. Chesley Burruss, *pro hac vice*
BALLARD SPAHR LLP
One Utah Center, Suite 800
201 South Main Street
Salt Lake City, Utah 84111-2221
Telephone: 801.531.3000
Facsimile: 801.531.3001
burts@ballardspahr.com


*Attorneys for Defendant*
*Prog Services, Inc. d/b/a Money App*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **STERLING KELLY, individually and on behalf of all others similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**PROG SERVICES, INC. d/b/a MONEY APP,**<br><br>**Defendant.** | **DEFENDANT'S MOTION TO COMPEL ARBITRATION OF PLAINTIFF'S INDIVIDUAL CLAIMS, OR, IN THE ALTERNATIVE, TO ENFORCE CLASS ACTION WAIVER IN THIS COURT AND MEMORANDUM IN SUPPORT**<br><br><br>**Case No. 2:25CV01026 TS-DBP**<br><br>**Judge Ted Stewart**<br>**Magistrate Judge Dustin B. Pead** |

**TABLE OF CONTENTS**

Page

I.    RELIEF SOUGHT AND GROUNDS FOR RELIEF.......................................................... 1

II.   FACTUAL BACKGROUND ........................................................................................ 2

    A.    Money App Offers An EWA Service ........................................................... 2

    B.    Plaintiff's Creation Of A Money App User Account ........................................... 3

    C.    Plaintiff's Agreements With Money App Arising From And Relating
        To His Money App User Account And Cash Advances ..................................... 4

III.  STATUTORY BACKGROUND ...................................................................................... 7

IV.   PROCEDURAL BACKGROUND.................................................................................... 8

V.    ARGUMENT............................................................................................................. 8

    A.    The FAA Applies And Requires Enforcement Of The Arbitration
        Provision ..................................................................................................... 8

    B.    There Is A Valid Agreement To Arbitrate ..................................................... 9

        1.    Utah law governs the issue of contract formation ................................. 9

        2.    The Arbitration Provision is valid under Utah law ............................... 9

    C.    Plaintiff's Claims Are Covered By The Arbitration Provision ...................... 10

    D.    The MLA's Provision Limiting Arbitration Does Not Apply Because
        Money App Does Not Extend Credit And Therefore Is Not Subject to
        the MLA ..................................................................................................... 12

        1.    Under Utah law, Money App does not extend "credit"........................ 13

        2.    Even if the Court does not look to Utah law, Money App does
            not extend "credit" under the MLA ..................................................... 14

            a.    Plaintiff did not incur a "debt"................................................ 14

            b.    The advances are not subject to a "finance charge"................. 15

    E.    Plaintiff's Likely Reliance On District Court Cases From Outside Of
        The Tenth Circuit Should Be Rejected ....................................................... 17

i

**F.      Alternatively, The Court Should Enforce The Class Action Waiver Provision And Strike The Class Action Claims** ................................................ **22**

**VI.    CONCLUSION** ............................................................................................................ **25**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adamson v. All. Mortg. Co.*, 861 F.2d 63 (4th Cir. 1988) ..............................................................17

*Asgrow Seed Co. v. Winterboer*, 513 U.S. 179 (1995) ..................................................................14

*Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279 (10th Cir. 1997) .......................................................9

*Baugh v. Allied Profs. Ins. Co.*,
2020 U.S. Dist. LEXIS 48792 (D. Utah Mar. 19, 2020) ........................................................9

*Billings v. Propel Fin. Servs., L.L.C.*, 821 F.3d 608 (5th Cir. 2016)..............................................15

*Bock v. Salt Creek Midstream LLC*,
2020 U.S. Dist. LEXIS 173103 (D.N.M. Sept. 22, 2020) ....................................................25

*Brunson v. Lenzi*, 2025 U.S. Dist. LEXIS 45274 (D. Utah Mar. 12, 2025) ...................................10

*Burrison v. FloatMe, Corp.*,
2026 U.S. Dist. LEXIS 31526 (D. Mass. Feb. 17, 2026) ......................................................19

*CFPB v. Snap Fin. LLC*, 2024 U.S. Dist. LEXIS 136828 (D. Utah Aug. 1, 2024)........................15

*Ching Ma. v. Twitter, Inc.*,
2024 U.S. Dist. LEXIS 113127 (N.D. Cal. Apr. 22, 2024) ....................................................12

*Copper State Leasing Co. v. Blacker Appliance & Furniture Co.*,
770 P.2d 88 (Utah 1988)...................................................................................................9, 10

*In re Davis*, 194 F.3d 570 (5th Cir. 1999) .....................................................................................14

*Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985)..............................................................11

*Espin v. Citibank, N.A.*, 2026 U.S. Dist. LEXIS 60703 (E.D.N.C. Mar. 23, 2026) ......................11

*Feeman v. Bridge It, Inc.*,
2026 U.S. Dist. LEXIS 70786 (S.D.N.Y. Mar. 31, 2026) .....................................................19

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995).......................................................9

*Golubiewski v. Activehours, Inc.*,
2025 U.S. Dist. LEXIS 167308 (M.D. Pa. Aug. 28, 2025) ...................................................18

*Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287 (2010) .............................................8, 9

*Hale v. First USA Bank, N.A.*,
  2001 U.S. Dist. LEXIS 8045 (S.D.N.Y. June 19, 2001)..........................................................10

*Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470 (10th Cir. 2006)............................................9

*Hendking v. Carvana LLC*,
  2022 U.S. Dist. LEXIS 200852 (N.D. Ohio Nov 3, 2022) ......................................................10

*Jacobsen Constr. Co. v. Teton Builders*, 2005 UT 4, 106 P.3d 719 (Utah 2005)...........................9

*John Call Eng'g, Inc. v. Manti City Corp.*, 743 P.2d 1205 (Utah 1987) ........................................9

*Johnson v. Activehours, Inc.*,
  2025 U.S. Dist. LEXIS 152809 (D. Md. Aug. 8, 2025) ...........................................................18

*KPMG LLP v. Cocchi*, 565 U.S. 18 (2011) .....................................................................................11

*Lavigne v. First Cmty. Bancshares, Inc.*,
  2020 U.S. Dist. LEXIS 67216 (D. Utah Jan. 29, 2020).............................................................12

*Lowe v. MoneyLion Techs. Inc.*,
  2026 U.S. Dist. LEXIS 48237 (S.D.N.Y. Mar. 6, 2026) ..........................................................19

*May v. Midland Funding*, 595 B.R. 894 (Bankr. E.D. Ark. 2019) ..................................................24

*May v. Midland Funding, LLC*, 591 B.R. 712 (Bankr. E.D. Ark. 2018) ........................................24

*Moss v. Cleo AI Inc.*, 799 F. Supp. 3d 1152 (W.D. Wash. 2025).............................................18, 19

*Moss v. Klover Holdings, Inc.*,
  2026 U.S. Dist. LEXIS 45382 (N.D. Ill. Mar. 5, 2026).............................................................19

*Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927 (N.D. Cal. 2025)...................................... *passim*

*Pa. Pub. Welfare Dep't v. Davenport*, 495 U.S. 552 (1990) .........................................................14

*Pagano v. NordicTrack, Inc.*, 749 F. Supp. 3d 1183 (D. Utah Sept. 19, 2024)..............................10

*Penhall v. Young Living Essential Oils*,
  2022 U.S. Dist. LEXIS 196790 (D. Utah Oct. 27, 2022) .........................................................10

*Ramirez v. Activehours, Inc.*,
  2026 U.S. Dist. LEXIS 63883 (N.D. Cal. Mar. 25, 2026).........................................................19

*Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63 (2010) .................................................................8

*Revell v. Grant Money, LLC*,
  2025 U.S. Dist. LEXIS 219239 (N.D. Cal. Nov. 5, 2025).....................................................18, 19

*Rogers v. 3Bear Energy, LLC*,
   2023 U.S. Dist. LEXIS 179873 (D.N.M. Oct. 4, 2023).......................................................24

*Russell v. Dave Inc.*,
   2025 U.S. Dist. LEXIS 262058 (C.D. Cal. Dec. 12, 2025) .................................................18, 19

*Soc'y of Pro. Eng'g Emps. in Aerospace, Local 2001 v. Spirit Aerosystems, Inc.*,
   681 F. App'x 717 (10th Cir. 2017) .......................................................................................8, 9

*Summer Rain v. Donning Co./Publishers, Inc.*, 964 F.2d 1455 (4th Cir. 1992) ...........................11

*Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996)...................................................................17

*Vickery v. Empower Finance Inc.*,
   2025 U.S. Dist. LEXIS 198834 (N.D. Cal. Oct. 7, 2025)....................................................18, 19

**Statutes**

9 U.S.C. § 1...............................................................................................................................23

9 U.S.C. § 4................................................................................................................................8

10 U.S.C. § 987, *et seq.*.................................................................................... *passim*

15 U.S.C. § 1602.......................................................................................................................20

15 U.S.C. § 1638, *et seq.*.................................................................................... *passim*

Utah Code Ann. § 13-78-106...............................................................................12, 13, 14

Utah Code Ann. § 78B-5-502(4) ...............................................................................13

**Other Authorities**

12 C.F.R. 1026.1 ...................................................................................................................7, 21

12 C.F.R. 1026.2 .............................................................................................................7, 12, 13

12 C.F.R. § 1026.4 .........................................................................................................8, 15, 16

12 C.F.R. pt. 1026, Supp. I, ¶2(a)(14) ...............................................................................20

32 C.F.R. § 232.3 .............................................................................................. *passim*

68 Fed. Reg. 16185 (Apr. 3, 2003) .....................................................................................16

80 Fed. Reg. 43560 (July 22, 2015).......................................................................................7

90 Fed. Reg. 60069 (Dec. 23, 2025)........................................................... *passim*

*Debt*, Black's Law Dictionary (12th ed. 2024)..................................................................................14

Debt, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/debt ..................................................................................14

Debt, Oxford English Dictionary, https://www.oed.com/dictionary/debt ....................................14

Fed. R. Civ. P. 12............................................................................................................................2

vi

## I.    RELIEF SOUGHT AND GROUNDS FOR RELIEF

Defendant Prog Services, Inc. d/b/a Money App ("Money App") offers an earned wage access ("EWA") product, which allows users to access portions of their earned wages prior to when that income would be deposited into their bank accounts from their employer. Use of the service is entirely voluntary. The service is free for standard delivery. The only fee ever charged to a user is the expedited fee, which is an optional charge paid by customers who desire to receive their cash advance immediately, instead of waiting two to three days. If a user does not choose the expedited delivery option, Money App provides a service that is a dollar-for-dollar transaction, in which no fees, interest, or other charges are paid.

Plaintiff Sterling Kelly ("Plaintiff") used Money App to "receive[] many" cash advances. Dkt. No. 1-1 ¶¶83–87. Based on those cash advances and the corresponding agreements he entered into with Money App, Plaintiff brings putative class claims for alleged violations of the Truth in Lending Act, 15 U.S.C. § 1638, *et seq.* ("TILA"), and the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA"). Dkt. No. 1-1 ¶¶102-120. Plaintiff's claims rest on the unsupported legal conclusion that Money App's cash advances are extensions of credit and that the TILA and MLA therefore apply. *Id.* ¶¶4, 7. But the TILA and MLA do not apply to Money App's cash advances. Plaintiff claims that Money App's Cash Advance Agreement ("CAS") violates the TILA because they do not disclose the interest rate applicable to the transaction, which ignores the fact that interest is not charged on the cash advances offered by Money App. *Id.* ¶8. Plaintiff also claims that Money App's CAS violates the MLA by: (1) charging interest above the 36% statutory Military Annual Percentage Rate cap; (2) failing to provide required MLA disclosures; and (3) requiring access to borrowers' deposit account as security for the cash advance. *Id.* ¶7. Plaintiff brings these claims by misstating the contours of Money App's cash advance service, misinterpreting the relevant regulations, and ignoring established law that EWA cash advances are

not credit and expedited transaction fees are not finance charges, which was reaffirmed in a recent Consumer Financial Protection Bureau ("CFPB") Advisory Opinion affirming that EWA products, like Money App, are not credit under Regulation Z of the TILA and optional expedited delivery fees are not finance charges. These claims fail as a matter of law and fact.

In addition, Plaintiff brought the claims in the wrong forum, and the Court should compel arbitration pursuant to Federal Rule of Civil Procedure 12(b)(1). Having accepted the Terms of Service ("TOS") when he created his Money App user account and each time he requested a cash advance, Plaintiff is required to arbitrate his claims on an individual basis pursuant to the arbitration provision governed by the Federal Arbitration Act (the "FAA"). And, as previously explained, any claims by Plaintiff that the arbitration provision is unenforceable pursuant to the MLA must fail because the MLA does not apply to Money App's cash advances.

In the alternative, if the Court declines to compel arbitration, the Court should strike the class claims pursuant to the independently enforceable class action waiver provision. The plain language of the class action waiver provision applies to *all* proceedings, not just proceedings in arbitration. The class action waiver provision is severable from the arbitration provision and is enforceable in its own right.

II.   **FACTUAL BACKGROUND**

   A.   **Money App Offers An EWA Service**

Money App offers an EWA service in the form of cash advances to its users, which allows users to access portions of their earned wages prior to when that income would be deposited into their bank accounts from their employer. Decl. of Josh Kannenberg ("Kannenberg Decl.") ¶4. Customers who obtain cash advances from Money App have already earned the wages that Money App advances. *Id*. ¶5. Before any user receives a cash advance from Money App, they must review and agree to the CAS. *Id*. ¶6, Exs. 1, 5. Under Money App's cash advance offering:

2

- Each cash advance is repayable in one installment, *id*. ¶8, Ex. 1 §IV, Ex. 5 §IV;

- Each cash advance transaction is non-recourse, which means that Money App cannot pursue the customer for payment, *id.* ¶9, Ex. 1 §IV, Ex. 5 §IV ("Money App warrants that it has no legal or contractual claim against you based on a failure to repay a Cash Advance . . . . [I]t will not engage in any debt collection activities, place the amount owed with or sell to a third party, or report you to a consumer reporting agency.");

- There are **no** finance charges, *id.* ¶10, Exs. 1, 5; and

- Customers do **not** pay interest, *id.* ¶11.

Users can obtain a cash advance from Money App free of charge. *Id.* ¶12. Money App also provides an expedited delivery option, whereby the requested cash advance amount is made immediately available. *Id.* ¶13, Ex. 1 §III, Ex. 5 §III. There is a charge for the optional expedited delivery and the charge is disclosed in the CAS and again on Money App's smart phone application or on its website before the customer completes the transaction. *Id.* ¶14. If the user does not want to pay the expedited delivery fee, the user can simply toggle to the standard delivery fee option or choose not to proceed with the transaction. *Id.* ¶15. The expedited delivery option is **entirely** voluntary—a user is never required to pay for expedited delivery. *Id.* ¶16, Ex. 1 §III, Ex. 5 §III. Unlike some of its competitors, Money App does not charge its users monthly fees or ask its users to tip. *Id.* ¶18.

Money App is a registered EWA service provider in Utah. *Id.* ¶19.

**B.    Plaintiff's Creation Of A Money App User Account**

On April 4, 2024, Plaintiff created a Money App user account. Kannenberg Decl. ¶20, Ex. 2. Upon visiting the Money App website, Plaintiff entered his email address and checked a

box agreeing to Money App's TOS. Kannenberg Decl. ¶23. Plaintiff would not have been able to create a Money App user account without agreeing to the TOS. *Id*. ¶24. Plaintiff then created a password and provided his legal name and phone number. *Id*. ¶25. Once Plaintiff entered his home address, social security number, and date of birth, Money App created his user account. *Id*. ¶26.

Once created, Plaintiff could utilize his account to request cash advances. *Id.* ¶27. To obtain a cash advance, Plaintiff had to link his Money App account with a bank account. *Id*. ¶28. Plaintiff could then provide Money App with information about his next paycheck and confirm his understanding that Money App would withdraw funds from his account on a specific date. *Id*. ¶29. After choosing the amount of the cash advance, Plaintiff could choose express or standard delivery. *Id*. ¶30. To receive those funds, Plaintiff reviewed and agreed to the terms of the CAS. *Id.* ¶31. Plaintiff had to review and agree to these terms for every cash advance he obtained. *Id*. ¶32. Plaintiff could revoke his consent to Money App being allowed to withdraw the funds from the linked account. *Id*. ¶33.

### C.    Plaintiff's Agreements With Money App Arising From And Relating To His Money App User Account And Cash Advances

As noted above, Plaintiff was required to agree to Money App's then existing TOS when he opened his account, and he had to acknowledge acceptance of the TOS by checking a box (*i.e.*, it was not pre-checked for him. *Id.* ¶34. The first sentence of the TOS identifies two core provisions of the agreement between the parties: (1) the Arbitration Provision and (2) the Class Action Waiver Provision:

> THIS USER AGREEMENT INCLUDES, AMONG OTHER THINGS, A BINDING ARBITRATION PROVISION AND A CLASS ACTION WAIVER. PLEASE REFER TO SECTION 22 BELOW FOR MORE INFORMATION.

*Id.* ¶35, Ex. 3 p.1. The TOS provide that "by using, accessing, interacting with, or signing up for the Services, you agree that you have read, understand, and agree to be bound by this Agreement." *Id.* ¶ 36, Ex. 3 §1.

Paragraph 22 of the TOS describes the Arbitration Provision and also includes a Utah choice of law provision:

> 22. **Dispute Resolution**. You agree that any dispute between you and Money App arising of or relating to this Agreement or the Services (collectively, "**Disputes**") will be governed by our Arbitration Agreement. Except as otherwise provided in the **Arbitration Agreement**, which is governed by the FAA, this Agreement and all related claims are governed by the laws of the State of Utah, without regard to conflict-of-law rules.

*Id.* ¶37, Ex. 3 §22. The words "**Arbitration Agreement**" appeared in bold blue font and are hyperlinked such that when a user clicks on the words, they are taken directly to the Arbitration Provision. *Id.* ¶37. The Arbitration Provision applies to Plaintiff's use of Money App's website, mobile applications, and the products and services offered, operated, or made available by Money App. *Id.* ¶39, Ex. 4 p.1. The Arbitration Provision broadly defines the term "Claim" as:

> [A]ny claim, dispute, or controversy between the user and Money App (including any Related Party) that arises from or relates in any way to the user's use of the Services; any of Money App's marketing, advertising, solicitations, and conduct relating to Money App's promotion of its products and services, including the Services; or Money App's disclosure of or failure to protect any information about the user. "Claim" is to be given the broadest reasonable meaning and includes claims of every kind and nature, including but not limited to, initial claims, counterclaims, cross-claims and third-party claims, and claims based on constitution, statute, regulation, ordinance, common law rule (including rules relating to contracts, torts, negligence, fraud or other intentional wrongs), and equity. It includes disputes that seek relief of any type, including damages and/or injunctive, declaratory, or other equitable relief.

*Id.* ¶40, Ex. 4 §2.b. The Arbitration Provision is governed by the FAA and to the extent that state law bears on the enforceability of arbitration, Utah law governs. *Id.* ¶41, Ex. 4 §9. The Arbitration Provision contains a right to reject clause permitting users to opt-out of arbitration within thirty

5

(30) days of agreeing to the TOS. *Id.* ¶42, Ex. 4 §1. Throughout his use of the Money App product, Plaintiff never opted out of the Arbitration Provision. *Id.* ¶43.

Plaintiff also agreed to the Class Action Waiver Provision, whereby he waived his right to participate in a class action **in arbitration or in court**. *Id.* ¶44, Ex. 4 §6 (some emphasis omitted). The term "Proceeding" is defined in the Arbitration Provision as "any judicial or arbitration proceeding regarding any Claim." *Id.* ¶45, Ex. 4 §2.c. The Arbitration Provision expressly refers to subsections (6)(iii), (6)(iv) and/or (6)(v) as the "Class Action and Multi-Party Claim Waiver." *Id.* ¶47, Ex. 4 §2.b. The Class Action Waiver Provision is found in subsection (6)(iii), which prohibits Plaintiff from "**PARTICIPAT[ING] IN A CLASS ACTION IN COURT OR IN ARBITRATION, EITHER AS A CLASS REPRESNTATIVE, CLASS MEMBER OR CLASS OPPONENT.**" *Id.*, §6. The Class Action Waiver Provision is severable from the other provisions of the Arbitration Provision. *Id.* ¶48, Ex. 4 §10.

On April 5, 2025, Plaintiff received his first cash advance in the amount of $100 from Money App. *Id.* ¶49. Plaintiff requested expedited delivery for this cash advance. *Id.* ¶50. Plaintiff agreed to the CAS before obtaining his first cash advance. *Id.* ¶51. Plaintiff also reaffirmed that he was bound by the TOS and Arbitration Provision. *Id.* ¶53, Ex. 1 p.1, Ex. 5 p.1.

Plaintiff has received 17 cash advances from Money App and each time agreed to the CAS, TOS and Arbitration Provision.  He never objected to the Arbitration Provision or any other terms. *Id.* ¶54. In fact, Plaintiff continued to obtain cash advances from Money App even after initiating this action, and each time entered into those same agreements. *Id*. ¶55. Plaintiff last received a cash advance from Money App on December 16, 2025. *Id.* ¶56. In 2026 alone, Plaintiff has submitted 25 new applications for a cash advance. *Id*. ¶57. Plaintiff's most recent request was on April 8, 2026. *Id*. ¶58.

### III.    STATUTORY BACKGROUND

Plaintiff brings claims under the MLA and TILA. The MLA provides that "[i]t shall be unlawful for a creditor to extend consumer credit to a covered member or a dependent of such a member with respect to which . . . the creditor requires the borrower to submit to arbitration[.]" 10 U.S.C. § 987(e)(3); *see also id.* 987(f)(4). But unless Plaintiff is a "covered member" and Money App is a "creditor" providing "consumer credit," this provision does not apply.

A "covered member" is "a member of the armed forces" either "on active duty under a call or order that does not specify a period of 30 days or less" or "on active Guard and Reserve Duty." *Id.* § 987(i)(1)(A)–(B). "Creditor" has the same meaning under both the MLA and TILA: "A person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments[.]" 12 C.F.R. § 1026.2(a)(17)(i) (TILA); *see also* 32 C.F.R. § 232.3 (i)(3) (applying Regulation Z definition of "creditor" to the MLA).

Rather than define "consumer credit," Congress directed the Department of Defense to do so. 10 U.S.C. § 987(h)(2)(D). Pursuant to that delegation, in 2015 the Department of Defense promulgated a rule that "consumer credit under the MLA would be defined consistently with credit that for decades has been subject to the disclosure requirements of the [TILA]." Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 80 Fed. Reg. 43560, 43560 (July 22, 2015). Accordingly, "consumer credit" has the same meaning under the MLA and TILA: "credit offered or extended to a covered borrower primarily for personal, family, or household purposes" that is either "[s]ubject to a finance charge" or "[p]ayable by a written agreement in more than four installments." 10 U.S.C. § 987(i)(6); 32 C.F.R. § 232.3(f)(1)(i)–(ii); *see also* 12 C.F.R. 1026.1(c)(1)(iii) (TILA). "Credit," which also has the same meaning under both statutes, is "the right . . . to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h) (MLA); 12 C.F.R. 1026.2(a)(14) (TILA). And "finance charge" means "any charge

7

payable directly or indirectly by the consumer and **imposed** directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a) (TILA) (emphasis added); *see also* 32 C.F.R. § 232.3(n) ("Finance charge [under the MLA] has the same meaning as 'finance charge' in Regulation Z.").

## IV.    PROCEDURAL BACKGROUND

Plaintiff initiated this action by filing the Complaint in the Third Judicial District Court of Salt Lake County, State of Utah. Dkt. No. 1-1. Money App timely removed the complaint to this Court on November 7, 2025. Dkt. No. 1. Money App filed an Answer to the Complaint on December 22, 2025. Dkt. No. 35. In its Answer, Money App expressly reserved its right to compel arbitration and to enforce the class action waiver. *Id*. p.68.

## V.    ARGUMENT

### A.    The FAA Applies And Requires Enforcement Of The Arbitration Provision

The Arbitration Provision is expressly governed by the FAA. *See* Kannenberg Decl. ¶41, Ex. 4 §9 ("Use of the Services involves interstate commerce and this Arbitration Provision shall be governed by the FAA[.]"). The FAA makes plain that a court is required to enforce arbitration provisions. *See* 9 U.S.C. § 4 ("The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."); *accord Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67–68 (2010) ("[T]he FAA . . . places arbitration agreements on equal footing with other contracts, and requires courts to enforce them according to their terms").

Given the strong presumption in favor of arbitration, courts in the Tenth Circuit compel arbitration if: (1) the parties formed an agreement to arbitrate; and (2) their dispute falls within the scope of the arbitration agreement. *Soc'y of Pro. Eng'g Emps. in Aerospace, Local 2001 v. Spirit*

*Aerosystems, Inc.*, 681 F. App'x 717, 721 (10th Cir. 2017) (unpublished) (citing *Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287, 299 (2010)).

### B. There Is A Valid Agreement To Arbitrate

#### 1. Utah law governs the issue of contract formation

In deciding whether to compel arbitration, a court must first determine whether an agreement to arbitrate exists. *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997) ("The existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked."). To do that, a court looks to "state law principles of contract formation to tell [it] whether an agreement to arbitrate has been reached." *Id*; *see also Hardin v. First Cash Fin. Servs., Inc*., 465 F.3d 470, 475 (10th Cir. 2006) ("Generally, courts 'should apply ordinary state-law principles that govern the formation of contracts' to determine whether a party has agreed to arbitrate a dispute." (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995))). Here, the TOS provides that Utah law governs. Kannenberg Decl. ¶37, Ex. 3 §22. Accordingly, Utah law applies to the issue of whether there is a valid agreement to arbitrate.[1]

#### 2. The Arbitration Provision is valid under Utah law

Under Utah law, a binding contract is formed if there is mutual assent between the parties supported by consideration. *John Call Eng'g, Inc. v. Manti City Corp*., 743 P.2d 1205, 1207–08 (Utah 1987). The Supreme Court of Utah has held that mutual assent is present when the parties voluntarily and knowingly sign an agreement, *id*., and that a promise in the alleged contract that is

---

[1]    Utah enforces choice of law provisions in contracts. *Baugh v. Allied Profs. Ins. Co*., 2020 U.S. Dist. LEXIS 48792, at *3 (D. Utah Mar. 19, 2020) (unpublished) ("In general, Utah courts enforce contractual choice-of-law provisions." (citing *Jacobsen Constr. Co. v. Teton Builders*, 2005 UT 4, ¶12, & n. 2, 106 P.3d 719 (Utah 2005))).

bargained for or made in exchange for something else constitutes consideration, *Copper State Leasing Co. v. Blacker Appliance & Furniture Co*., 770 P.2d 88, 91 (Utah 1988).

Plaintiff entered into an agreement to arbitrate with Money App when he clicked the checkbox accepting the TOS on April 4, 2024. Kannenberg Decl. ¶23. Plaintiff reaffirmed his agreement to arbitrate each of the 17 times he took a cash advance and agreed to the CAS, TOS, and Arbitration Provision. *Id.* ¶54. Such agreements are routinely enforced under Utah law. *See, e.g., Brunson v. Lenzi*, 2025 U.S. Dist. LEXIS 45274, at *7–8 (D. Utah Mar. 12, 2025) (unpublished) (enforcing arbitration agreement under Utah law that required the plaintiff consent to terms or conditions in order to proceed as an auction user on defendant's website); *Penhall v. Young Living Essential Oils*, 2022 U.S. Dist. LEXIS 196790, at *13–14 (D. Utah Oct. 27, 2022) (unpublished) (enforcing arbitration agreement under Utah law where user affirmatively checked box accepting terms accessible by hyperlink); *Pagano v. NordicTrack, Inc*., 749 F. Supp. 3d 1183, 1190–91 (D. Utah Sept. 19, 2024) (same).

### C.    Plaintiff's Claims Are Covered By The Arbitration Provision

Plaintiff's claims fall within the broad scope of the Arbitration Provision. That provision defines "Claim" as "any claim, dispute, or controversy between the user and Money App (including any Related Party) that arises from or relates in any way to the user's use of the Services." Kannenberg Decl. ¶40, Ex. 4 §2.b. The Arbitration Provision further provides that "Claim" is to be given "the broadest reasonable meaning." *Id.* Plaintiff's MLA and TILA claims "arise[] from or relate[] . . . to the user's use of the Services." *Id.*

Courts uniformly agree that TILA claims are arbitrable. *See, e.g.*, *Hale v. First USA Bank, N.A.*, 2001 U.S. Dist. LEXIS 8045, at *22–24 (S.D.N.Y. June 19, 2001) (unpublished) (collecting cases and concluding that a plaintiff's TILA claims were arbitrable); *Hendking v. Carvana LLC*, 2022 U.S. Dist. LEXIS 200852, at *16 (N.D. Ohio Nov 3, 2022) (unpublished) ("Plaintiff makes

no argument that Congress intended for TILA claims to be non-arbitrable. Further, this Court has previously found TILA claims to be arbitrable.").

But even if Plaintiff's separately-pled MLA claim is not subject to arbitration (it is), his TILA claim must still be arbitrated. Plaintiff's TILA claim is not dependent on his status as an active servicemember. In any event, the FAA "require[s] that if a dispute presents multiple claims, some arbitrable and some not, the former must be sent to arbitration." *KPMG LLP v. Cocchi*, 565 U.S. 18, 19 (2011). "[T]he fact that the matters to be arbitrated may be 'intertwined factually and legally' with the matters to be decided by the district court no longer presents an obstacle to arbitration of the arbitrable matters." *Summer Rain v. Donning Co./Publishers, Inc.*, 964 F.2d 1455, 1460 (4th Cir. 1992). That is true "even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985); *see also KPMG*, 565 U.S. at 19. In *Espin v. Citibank, N.A.*, the Fourth Circuit reversed a district court's order denying Citibank's motion to compel individual arbitration of plaintiffs' claims that Citibank violated the Servicemembers Civil Relief Act ("SCRA"), the Credit CARD Act of 2009, TILA, and the MLA with instructions: (1) to compel arbitration on all claims except those brought under the MLA; (2) to determine whether the MLA applies to the plaintiffs' credit card accounts; and (3) if necessary, to resolve any other issues that the parties might raise as to those MLA claims. 126 F.4th 1010, 1015, 1020 (4th Cir. 2025).[2]

---

[2] On remand, the district court determined that the MLA did not apply to the plaintiffs' accounts and therefore compelled arbitration of all of the plaintiffs' remaining claims. *Espin v. Citibank, N.A.*, 2026 U.S. Dist. LEXIS 60703, at *7, 19 (E.D.N.C. Mar. 23, 2026) (unpublished). As such, the district court did not need to address the Fourth Circuit's instruction to maintain jurisdiction over the plaintiffs' MLA claim while compelling arbitration on all other claims. Nonetheless, the Fourth Circuit's remand instructing the district court to compel arbitration on all claims except those brought under the MLA supports Money App's position that the binding arbitration provision at issue in this case applies to Plaintiff's TILA claim, even when pled alongside Plaintiff's MLA claim.

11

Here, Plaintiff's TILA claim is indisputably arbitrable and must be sent to arbitration on an individual basis according to the above precedent.

**D.**    **<u>The MLA's Provision Limiting Arbitration Does Not Apply Because Money App Does Not Extend Credit And Therefore Is Not Subject to the MLA</u>**

Plaintiff cannot use the MLA to avoid the Arbitration Provision because the MLA does not apply to or govern Money App's cash advances. The MLA applies only to extensions of credit, and Money App's EWA product is not an extension of credit because it is not debt, does not impose finance charges, and is not repayable in four or more installments.[3]

As an initial matter, while both the MLA and TILA define "credit" with reference to "debt," 32 C.F.R. § 232.3(h) (MLA); 12 C.F.R. 1026.2(a)(14) (TILA), neither defines "debt."

But defining "debt" reveals why Plaintiff's argument fails. First, under Utah law, which governs the TOS and is the venue in which Plaintiff choose to file this lawsuit, EWA products are "not offering a loan or other form of credit or debt." Utah Code Ann. § 13-78-106(1)(b).

Second, even if the Court does not apply Utah law, Plaintiff's argument ignores well established law that EWA transactions are not credit and that expedited transaction fees are not finance charges. *See infra* §IV.D.2 The CFPB reaffirmed both of these principles in its December 23, 2025 Advisory Opinion. *See* Truth in Lending (Regulation Z); Non-applications to Earned Wage Access Products, 90 Fed. Reg. 60069, 60071 (Dec. 23, 2025) (hereinafter "CFPB AO")

---

[3]    Any effort to avoid arbitration by arguing Money App's EWA product is an extension of credit would be a wholly improper attempt by Plaintiff to avoid the one-way intervention doctrine as that challenge would require determination of the merits of Plaintiff's claim prior to any decision on class certification. *See Lavigne v. First Cmty. Bancshares, Inc.*, 2020 U.S. Dist. LEXIS 67216, at *2 (D. Utah Jan. 29, 2020) (unpublished) (One-way intervention doctrine "generally provides the merits of an action should not be decided until after the class has been certified and notified." (citations omitted)). Any such efforts should be firmly rejected. *See Ching Ma. v. Twitter, Inc.*, 2024 U.S. Dist. LEXIS 113127 (N.D. Cal. Apr. 22, 2024) (unpublished) (recognizing applicability of one-way intervention doctrine to motions to compel arbitration).

("This advisory opinion does not state, and nothing in it should be understood to state, that EWA products that are *not* Covered EWA *are* credit under Regulation Z.").[4] The CFPB AO also explains that optional expedited delivery fees are not finance charges "since consumers can receive exactly the same service without paying the fee." *Id*. at 60075; *see also id.* ("In the normal course, expedited delivery fees are the cost of obtaining earned wages more quickly than via ACH, and are triggered by the consumer's opting for expedited delivery; they are not 'directly or indirectly imposed' by the provider.").

Based on the above and as shown below, Money App does not extend "consumer credit" because no debt is incurred by, and no finance charge imposed on, the user.

### 1. Under Utah law, Money App does not extend "credit"

Pursuant to the TILA and Utah Law, Money App's EWA product is not "debt" and therefore cannot be subject to the arbitration bar in the MLA. Where a term is undefined in TILA, this Court should assume it has "the meaning[] given to [it] by state law or contract." 12 C.F.R. § 1026.2(b)(3). The relevant contract, the TOS, does not define "debt," but it does include a Utah choice of law provision. Kannenberg Decl. ¶37, Ex. 3 §22.

Under Utah law, "'[d]ebt' means a legally enforceable monetary obligation or liability of an individual, whether arising out of contract, tort, or otherwise." Utah Code Ann. § 78B-5-502(4). Relevant here, however, in 2025, Utah enacted the Earned Wage Access Services Act, which explains that "[a] provider offering or providing earned wage access services in this state . . . is not offering a loan or other form of credit or debt, if the provider is not a creditor, a debt collector, or a lender." Utah Code Ann. § 13-78-106(1)(b). It follows that Money App, a licensed EWA provider in Utah, by definition does not offer "a loan or other form of credit or debt." *Id.* § 13-78-

---

[4]   A true and correct copy of the CFPB AO is attached as Exhibit 6.

106(1)(b). Nor are "[expedite f]ees, voluntary tips, gratuities, or other donations paid to the provider, in accordance with this chapter, . . . interest or finance charges." Utah Code Ann. § 13-78-106(2). Money App does not extend credit and is therefore not subject to the MLA.

> **2.      Even if the Court does not look to Utah law, Money App does not extend "credit" under the MLA**

> **a.      Plaintiff did not incur a "debt"**

Even if the Court does not follow applicable Utah law, which states explicitly that EWA products do not offer "debt," Plaintiff still cannot show that he incurred "debt" by using Money App's EWA product. As noted above, "debt" is not defined in the MLA, but undefined terms in a statute should be given "their ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). "The Supreme Court has held that the plain meaning of a 'debt' . . . is nothing more or less than an **enforceable obligation**." *In re Davis*, 194 F.3d 570, 577 (5th Cir. 1999) (emphasis added) (quoting *Pa. Pub. Welfare Dep't v. Davenport*, 495 U.S. 552, 559 (1990)). The CFPB further explained that "the common meaning of debt is ... a financial **liability or obligation** owed by one person, the debtor, to another, the creditor." 90 Fed. Reg. 60069, 60071 (emphasis added) (citation omitted).

This aligns with the ordinary and legal definitions of "debt." *See* Debt, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/debt ("Something owed: obligation"); Debt, Oxford English Dictionary, https://www.oed.com/dictionary/debt ("That which is owed or due; anything (as money, goods, or service) which one person is under obligation to pay or render to another."); *Debt*, Black's Law Dictionary (12th ed. 2024) ("Liability on a claim; a specific sum of money due by agreement or otherwise.") And, thus, a debt is something one is obligated to repay.

Plaintiff's cash advances from Money App did not create any such obligation. Money App merely provided Plaintiff with access to wages he had earned prior to those monies being deposited in his bank account in the form of a cash advance. Kannenberg Decl. ¶4. Contrary to the definition of debt, the CAS makes plain that there is no repayment obligation. *See id.* ¶9, Ex. 1 §IV, Ex. 5 §IV. Because Plaintiff was not obligated to pay back the advances, no debt was created and Money App's EWA product is therefore not credit.[5] *See, e.g.*, *Billings v. Propel Fin. Servs., L.L.C.*, 821 F.3d 608, 611–13 (5th Cir. 2016) (because there was no "debt" there was no "extension of credit" under TILA).

### b.    The advances are not subject to a "finance charge"

Money App's EWA product is also not credit because there is no finance charge. MLA regulations define "finance charge" as

> any charge payable directly or indirectly by the consumer and **imposed** directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.

12 C.F.R. § 1026.4(a) (emphasis added); *see also* 32 C.F.R. § 232.3(n) ("Finance charge has the same meaning as 'finance charge' in Regulation Z").

Customers who obtain cash advances from Money App do **not** pay monthly fees, interest, or tips. Kannenberg Decl. ¶¶11, 18. Money App users are only charged a fee if they choose to expedite the delivery of their cash advance. *Id*. ¶14. Users are not required to request expedited delivery. *Id*. ¶16. Paying an expedited delivery fee is not **imposed** (*i.e.*, forced) on the customer. In addition, paying that fee is not a "condition of" or "incident to" the use of the Money App

---

[5]    *See also CFPB v. Snap Fin. LLC*, 2024 U.S. Dist. LEXIS 136828, at *18 (D. Utah Aug. 1, 2024) (unpublished) (the "formal terms of the" contract control whether a transaction is the extension of "credit," not a plaintiff's allegations as to the "practical operation" of the contract).

15

product but rather, as Plaintiff admits, the payment of expedited delivery fees is "notionally optional and users can use an EWA product without paying one." Dkt. No. 1-1 ¶47. Indeed, more than 141,000 Money App transactions have been completed by customers who chose not to pay the expedited delivery fee. Kannenberg Decl. ¶17. As such, the expedited delivery fee cannot be a finance charge because it was not imposed on Plaintiff and was not a condition of or even incidental to the cash advance. *See* 12 C.F.R. § 1026.4(a) (defining "finance charge" as "**imposed** directly or indirectly by the creditor" (emphasis added)); *Truth in Lending*, 68 Fed. Reg. 16185, 16186 (Apr. 3, 2003) ("a fee for expedited delivery of a credit card is not incidental to the extension of credit and thus is not a finance charge where the consumer requests the service and the card is also available by standard mail service (or another means that is at least as fast) without a fee").

Indeed, the CFPB—the primary federal regulator responsible for interpreting the TILA and Regulation Z (which the MLA references for all definitions relevant here)—has expressly held that expedited delivery fees in EWA transactions are not finance charges. The CFPB AO explains that it is not "writ[ing] on a clean slate," but it had already considered two similar expedited fees relating to "credit cards accessing home equity lines of credit." 90 Fed. Reg. at 60075. The first was "a fee for expediting a consumer's payment" and the second "a fee for expending delivery of the physical card." *Id.* In both cases, the Board of Governors of the Federal Reserve System, which made these determinations prior to the creation of the CFPB, determined that neither was a finance charge because the consumer could accomplish both—*i.e.*, (1) make a payment on the account and (2) receive the card by standard mail—without paying an additional fee. *Id.* The same is true here where "consumers can receive **exactly the same service without paying the [expedited] fee**," *id.* (emphasis added)*,* and regularly do so in actual practice.

16

To support its conclusion, the CFPB cited *Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996). In that case, the plaintiff brought suit against a financial institution for its alleged failure to satisfy TILA disclosure requirements. *Id.* at 579. One such failure the plaintiff alleged was a $21 Federal Express charge that was not included as a Finance Charge. *Id.* In affirming the district court, the Eleventh Circuit explained that "we are not convinced that the Federal Express fee was required by Citibank," and "[i]f the borrower can choose to avoid the Federal Express fee by having the documents sent via regular mail, then the fee is not imposed as an incident to the extension of credit." *Id.* (citations omitted); *see also id.* ("Since the *Veales* could have chosen not to pay the Federal Express fee and the bank did not require it, then the fee was not imposed as an incident to the extension of credit and need not be included in the Finance Charge."); *Adamson v. All. Mortg. Co.*, 861 F.2d 63, 65–66 (4th Cir. 1988) (a $51 fee to release a deed of trust was not a "finance charge" under the TILA because the loans associated with the transaction "were in no way conditioned on the plaintiffs agreeing to pay the release fees; the record reveals no evidence that the plaintiffs were ever under any legal obligation to pay the fees").

Voluntary fees payable at the user's election are not finance charges. Plaintiff could have opted for standard delivery and avoided the expedited delivery fee, as has been the case in more than 141,000 Money App transactions. Kannenberg Decl. ¶¶15–17. Money App's expedited delivery option is always **entirely** voluntary and never imposed—therefore, it is not a finance charge.

### E.     Plaintiff's Likely Reliance On District Court Cases From Outside Of The Tenth Circuit Should Be Rejected

As previewed in the Joint Motion for Scheduling Conference, Dkt. No. 36 p.6 n.1, Plaintiff will likely rely on orders by district courts outside of the Tenth Circuit to support his position that he adequately alleged facts that could plausibly render the Money App product subject to both the

MLA and TILA. But all of those cases, as well as five other out-of-circuit cases not cited in the Joint Motion for Scheduling Conference, directly cite or rely on the same incorrect reasoning as *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 935 (N.D. Cal. 2025), to determine whether an EWA product extends "credit." In *Orubo*, the district court defined "credit" by looking to inapplicable agency guidance and without determining the meaning of "debt." In doing so, it overlooked the fact that cash advances using EWA products are not payday loans. In fact, Money App's cash advances are for all intents and purposes dollar for dollar transactions. *Orubo* is wrong, and its flawed reasoning forms the basis of each and every case Plaintiff is likely to rely upon.[6]

The cases Plaintiff cites in the Joint Motion for Scheduling Order all rely on *Orubo*, at least in part. *See Johnson v. Activehours, Inc.*, 2025 U.S. Dist. LEXIS 152809, at *24 (D. Md. Aug. 8, 2025) (unpublished) ("As the Northern District of California explained in *Orubo*, however, nowhere does the statute or the regulation implementing it indicate that courts should interpret 'credit' to require a legal obligation to repay." (citation and internal quotation marks omitted)); *Golubiewski v. Activehours, Inc.*, 2025 U.S. Dist. LEXIS 167308, at *19 (M.D. Pa. Aug. 28, 2025) (unpublished) (citing *Orubo* in its discussion of "credit");[7] *Moss v. Cleo AI Inc.*, 799 F. Supp. 3d 1152, 1159 (W.D. Wash. 2025) (noting that "[t]his [c]ourt reaches the same conclusion" as *Orubo*); *Vickery v. Empower Finance Inc.*, 2025 U.S. Dist. LEXIS 198834, at *16 (N.D. Cal. Oct. 7, 2025) (unpublished) (employing the same reasoning as *Orubo* in determining whether the defendant EWA extends "credit"); *Revell v. Grant Money, LLC*, 2025 U.S. Dist. LEXIS 219239, at *27–33 (N.D. Cal. Nov. 5, 2025) (unpublished) (relying on *Orubo* in holding that the

---

[6]   Nor did *Orubo* have the benefit of the CFPB AO, which was issued after the district court in *Orubo* filed its order.

[7]   *Orubo*, *Johnson*, and *Golubiewski* do not include a claim under the MLA.

defendants' EWA product is "credit" under the MLA); *Russell v. Dave Inc.*, 2025 U.S. Dist. LEXIS 262058, at *17–25 (C.D. Cal. Dec. 12, 2025) (unpublished) (same).

Five additional recent cases exhibit the same reliance on *Orubo*. *See Ramirez v. Activehours, Inc.*, 2026 U.S. Dist. LEXIS 63883, at *6 (N.D. Cal. Mar. 25, 2026) (unpublished) (order from same district court judge as *Orubo* rejecting the defendant's argument that the EWA product is not a "loan" or "credit" and that it does not impose a "finance charge" "for the reasons stated below and in this Court's order in *Orubo*"); *Burrison v. FloatMe, Corp.*, 2026 U.S. Dist. LEXIS 31526, at *17 (D. Mass. Feb. 17, 2026) (unpublished) (citing *Orubo* to support the conclusion that the defendant's cash advances are "credit"); *Lowe v. MoneyLion Techs. Inc.*, 2026 U.S. Dist. LEXIS 48237, at *9 (S.D.N.Y. Mar. 6, 2026) (unpublished) (same); *Moss v. Klover Holdings, Inc.*, 2026 U.S. Dist. LEXIS 45382, at *17 (N.D. Ill. Mar. 5, 2026) (unpublished) (citing *Orubo* and cases stemming from it to conclude "the TILA and MLA apply to Earned Wage Access products");[8] *see also Feeman v. Bridge It, Inc.*, 2026 U.S. Dist. LEXIS 70786, at *17–18 (S.D.N.Y. Mar. 31, 2026) (unpublished) (citing and reaching the same conclusions as *Orubo*).[9, 10]

---

[8] To the extent the district court in *Klover Holdings, Inc.* relies on a meaning of "debt" that includes "a contractually unenforceable obligation to repay a sum of money that is nevertheless enforceable under equitable theories such as unjust enrichment and promissory estoppel," such claims are barred by the CAS. Kannenberg Decl., Ex. 1 §IV, Ex. 5 §IV ("Money App warrants that it has no legal or contractual claim against you based on a failure to repay a Cash Advance").

[9] The EWA product at issue in *Feeman* required customers to agree to "monthly subscription charges," which were either "Premium" or "Plus." 2026 U.S. Dist. LEXIS 70786, at *7. "Premium subscribers are not charged expedited delivery fees." *Id.* Plaintiff does not allege that he enrolled in a subscription service with Money App or that Money App even had a subscription option.

[10] In *Cleo AI Inc.*, *Vickery*, *Revell*, *Russell*, *Burrison*, and *Lowe*, the district court denied the defendant's motion to compel arbitration, and the defendant filed an appeal. All six cases are stayed pending the outcome of those appeals. The defendant in *Feeman* appealed the district

But in determining that the EWA product at issue in *Orubo* advances "credit" under TILA, the district court cited TILA's definition of credit, 15 U.S.C. § 1602(f), and then jumped to agency guidance that is not applicable to EWA products. 780 F. Supp. 3d at 935 (citing 12 C.F.R. pt. 1026, Supp. I, ¶2(a)(14)). That guidance, found in Regulation Z, explains that a "payday loan" or "payday advance" or "deferred-presentment loan," becomes "credit" when,

> a cash advance is made to a consumer in exchange for the consumer's personal check, or in exchange for the consumer's authorization to debit the consumer's deposit account, and where the parties agree either that the check will not be cashed or deposited, or that the consumer's deposit account will not be debited, until a designated future date.

12 C.F.R. pt. 1026, Supp. I, ¶2(a)(14).

EWA cash advances are not payday loans. While a payday loan is a recourse loan that the consumer is legally obligated to repay, and requires an "exchange" of (1) the consumer's check or (2) authorization to debit the consumer's bank account, Money App's EWA cash advances do not require repayment and are non-recourse. Indeed, the CAS states explicitly that Money App has no legal or contractual claim against a customer based on their failure to repay a cash advance, nor will Money App engage in debt collection activities, place the amount with or sell it to a third party, or report the consumer to a reporting agency. *See supra* §II.A. Because Money App customers have no contractual obligation to make payments to Money App, EWA products are excluded from the meaning of "credit" cited by the district court in *Orubo*. *See* 780 F. Supp. 3d at 935; 12 C.F.R. pt. 1026, Supp. I, ¶2(a)(14)(1)(i)–(v) (setting forth "situations" that are not considered credit, including "[l]ayaway plans," "[i]nsurance premium plans," and "[h]ome

court's order denying the motion to dismiss or compel arbitration, and the district court ordered the plaintiff to show cause by April 17, 2026 why the case should not be stayed.

20

improvement transactions" where the consumer is not contractually obligated "to continue making payments").[11] In *Orubo*, the district court concluded that, "[n]owhere does the statute or the regulation implementing it indicate that courts should interpret 'credit' to require a legal obligation to repay." 780 F. Supp. 3d at 935. But the district court in *Orubo* and its progeny of follow-on court decisions never sought to define "debt" as used in the definition of "credit," looking instead to inapposite agency guidance, and thus, skipped a critical component of the legal analysis required to determine of an EWA cash advance is "consumer credit." Moreover, the specific agency guidance *Orubo* relied upon **excludes** from the definition of "credit" services that do not include a contractual obligation to repay—services like Money App.

Money App customers do not incur "debt." In addition, Money App does not impose its optional expediting fee on its customers, and thus, does not subject its customers to a "finance charge." *See supra* §V.D. This, coupled with the fact that Money App does not provide any product that is "[p]ayable by a written agreement in more than four installments" also means that Money App does not extend "consumer credit," and thus, by definition is not subject to the TILA or MLA. 10 U.S.C. § 987(i)(6); 32 C.F.R. § 232.3(f)(1)(i)–(ii); *see also* 12 C.F.R. 1026.1(c)(1)(iii) (TILA). EWA products are relatively new, and in its efforts to address these novel issues, the district court in *Orubo*—which did not have the benefit of the December 2025 CFPB AO—missed the mark. *Orubo*'s domino effect has created great uncertainty in the industry and allowed well-intentioned, but flawed, legal reasoning to interfere with a product relied upon by thousands of hardworking

---

[11]    Indeed, *Orubo*'s failure to define "debt" or to acknowledge the exclusions set forth in Supplement I to Part 1026 implicitly extends the definition of "debt" to include any authorized auto payment even when a consumer may cancel it at any time (*e.g.*, streaming services, gym memberships, food delivery services, etc.).

people around the country. This Court has the opportunity to revisit this important issue and get it right.

        **F.**        **<u>Alternatively, The Court Should Enforce The Class Action Waiver Provision And Strike The Class Action Claims</u>**

To the extent adjudicating this motion requires analysis of the applicability of the MLA or if the Court preliminarily determines the MLA applies,[12] the propriety of which is specifically denied, the Court should nevertheless enforce the Class Action Waiver Provision. By its plain language, the Class Action Waiver Provision applies to **all** proceedings arising from disputes between the parties. The Class Action Waiver Provision states clearly that neither Plaintiff nor Money App have the right to "[p]articipate in a class action **in court or in arbitration**, either as a class representative, class member or class opponent," "[a]ct as a private attorney general in court or in arbitration," or "join or consolidate claim(s) involving the user with claims involving any other person." Kannenberg Decl. ¶46, Ex. 4 §6 (some emphasis omitted). Plaintiff "seeks to represent two classes of individuals," Dkt. No. 1-1 ¶90, in direct contravention of the parties' agreement that Plaintiff would not "[p]articipate in a class action in court" as "class representative."

First, insofar as Plaintiff argues that this issue is also governed by *Orubo* and its progeny, he is wrong. No defendant in those previously cited cases argued that a class action waiver provision was severable from the other provisions of the relevant agreement. And, to the extent any class action waiver provision was even addressed in those cases, it did not include the language applicable here: "**in court or in arbitration**." Kannenberg Decl. ¶46, Ex. 4 §6 (some emphasis omitted). Finally, no court has held that the MLA prohibits class action waiver provisions.

---

[12]    Money App submits that deciding the applicability of the MLA would violate the one-way intervention doctrine. *See supra* n.3.

Second, the Class Action Waiver Provision is severable from the Arbitration Provision. The Arbitration Provision states clearly that, "[i]f any part of this Arbitration Provision cannot be enforced, the rest of this Arbitration Provision will continue to apply." *Id.* ¶48, Ex. 4 §10. In other words, the Class Action Waiver Provision survives any ruling by a court that the Arbitration Provision is unenforceable.

Courts have enforced severable class action waivers contained in unenforceable arbitration agreements. In *Porteous v. Flowers Foods, Inc.*, a district court in Oregon considered a motion to compel arbitration and strike class and collective allegations. 766 F. Supp. 3d 1093 (D. Or. 2025). The plaintiff entered into a distribution agreement with the defendant that required the plaintiff to deliver products to retailers each week. *Id.* at 1099. The parties also entered into an arbitration agreement providing that any claim or dispute between the parties arising from or relating to the distributor agreement shall be submitted to and determined exclusively by binding arbitration under the FAA. *Id.* at 1100. The arbitration agreement contained a severable collective and class action waiver that prohibited the parties from initiating or maintaining any "Covered Claim" on a class, collective, representative, or multi-plaintiff basis, either in court or in arbitration. *Id.* And "Covered Claims" were defined as any claims challenging the independent contractor status of the distributor. *Id.*

The plaintiff argued that the arbitration agreement was unenforceable under the FAA pursuant to the transportation worker exception found in 9 U.S.C. § 1.[13] *Id.* at 1101. The court agreed and declined to compel arbitration of Plaintiff's claims. *Id.* at 1105. Despite finding that the arbitration agreement was unenforceable under Section 1 of the FAA, the court simultaneously

---

[13] The FAA exempts certain categories of workers from the provisions of the statute, specifically exempting "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1.

23

struck the collective and class action allegations from the Complaint concluding that "the class and collective action waiver is distinct from the agreement to arbitrate, and, by operation of the severability clause, it survives the Court's determination that the agreement to arbitrate is unenforceable." *Id*.

Similarly, after denying the defendant's motion to compel arbitration, the bankruptcy court in *May v. Midland Funding, LLC*, 591 B.R. 712, 724 (Bankr. E.D. Ark. 2018) (hereinafter "*May I*"), enforced a class action waiver contained in the same arbitration provision, *May v. Midland Funding* 595 B.R. 894 (Bankr. E.D. Ark. 2019) (hereinafter "*May II*"). The bankruptcy court first explained that the action was a core bankruptcy proceeding that presented an inherent conflict between the Bankruptcy Code and the FAA and denied arbitration, concluding that the issue was "more properly decided by bankruptcy court than an arbitrator." *May I*, 591 B.R. at 723. Despite refusing to compel arbitration, the Bankruptcy Court nevertheless enforced the class action waiver reasoning:

> The [class action] waiver enforceability analysis is independent of and not subsumed in the "inherent conflict" analysis set forth in the court's Order rejecting the arbitration provision as contrary to an underlying purpose of the Bankruptcy Code. Two independent and complimentary bases suggest that this analysis can proceed. First, the "inherent conflict" analysis . . . observed in the Order appears to apply to the entirety of the appropriate forum determination rather than any procedural specifics in either. Second, the agreement contains a severability clause in the event the court does not compel arbitration.

*May II*, 595 B.R. at 898 n.5 (internal citations omitted).

District courts in the Tenth Circuit have likewise relied upon the breadth of language used in class action waiver provisions in ruling that severable class action waiver provisions must be enforced, even where a court or an arbitrator has declined to enforce the arbitration provision with regard to the same dispute. *See, e.g.*, *Rogers v. 3Bear Energy, LLC*, 2023 U.S. Dist. LEXIS 179873, at *1–2 (D.N.M. Oct. 4, 2023) (unpublished) (rejecting the plaintiff's argument that, because the

24

arbitration agreement does not apply, "the class action waiver within the arbitration agreement also does not apply," and ruling that they "are separate legal issues," "the contract contains a severability clause," and "the plain language of the contract indicates that the class action waiver applies to all class action 'claims of any kind'"); *Bock v. Salt Creek Midstream LLC*, 2020 U.S. Dist. LEXIS 173103, at *31 (D.N.M. Sept. 22, 2020) (unpublished) (concluding "that the class action waiver . . . does not contain any limitation whatsoever on the disputes or the parties to the disputes that fall within its scope and is independently applicable, regardless of whether it is in connection with an arbitration provision or another kind of employment agreement").

The same conclusion should be reached here. The Class Action Waiver Provision applies to any dispute, whether in court or arbitration, and it is severable and enforceable. Should this matter proceed in this Court, the Class Action Waiver Provision should be enforced, the class allegations should be stricken, and this matter should advance only on an individual basis.

## VI.    CONCLUSION

For the foregoing reasons, the Court should grant Money App's request to compel arbitration and stay these proceedings pending the outcome of that arbitration. In addition, the Court should find that the Class Action Waiver Provision is severable and enforceable, and bar Plaintiff from pursuing his class claims in this or any other forum.

Dated: April 17, 2026               Respectfully submitted by,

                                    /s/ *Steven D. Burt*
                                    Steven D. Burt, Esq.
                                    Daniel J.T. McKenna, *pro hac vice*
                                    Jenny N. Perkins, *pro hac vice*
                                    Robert T. Lieber, *pro hac vice*
                                    J. Chesley Burruss, *pro hac vice*
                                    BALLARD SPAHR LLP
                                    *Attorney for Defendant Prog Services, Inc.*
                                    *d/b/a Money App*

25

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct of copy of the foregoing MOTION TO COMPEL ARBITRATION OF PLAINTIFF'S INDIVIDUAL CLAIMS, OR, IN THE ALTERNATIVE, TO ENFORCE CLASS ACTION WAIVER IN THIS COURT was served to the following this 17th day of April 2026, in the manners set forth below:

[ X ] Through the CM/ECF System for the U.S. District Court

[ ] Hand Delivery

[ ] U.S. Mail, postage prepaid

[ ] E-mail:    llowther@cbplaw.com; cbrown@cbplaw.com; rpulliam@cbplaw.com; joshua@jacobsonphillips.com; jscott@aklawfirm.com


Jared D. Scott
ANDERSON & KARRENBERG
50 West Broadway, Suite 600
Salt Lake City, Utah 84101-2035
*Attorney for Plaintiff*

Lee Lowther
Courtney Brown
Randall K. Pulliam
CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Suite 1400
Little Rock, AR 72207

Joshua Jacobson
JACOBSON PHILLIPS, PLLC
2277 Lee Road, Ste. B
Winter Park, FL 32789


*/s/ Steven D. Burt*


26